## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

TIMOTHY M. CONNER,

     Plaintiff,

v.            CIVIL ACTION NO.   2:19-cv-00329

ASSOCIATED RADIOLOGISTS, INC., et al.,

     Defendants.

### MEMORANDUM OPINION AND ORDER

Pending before the Court are Plaintiff Timothy Conner, M.D.'s ("Dr. Conner") Motion for Summary Judgment on Affirmative Claims of Complaint, (ECF No. 104), and Motion for Summary Judgment on Counterclaim, (ECF No. 106).   Also pending before the Court is Defendants Associated Radiologists, Inc. ("ARI"); John Anton, M.D.; Michael Anton, M.D.; Stephen Elksnis M.D.; and Johnsey Leef, III, M.D.'s (collectively "Physician Defendants," and collectively with ARI, "Defendants") Motion for Summary Judgment.   (ECF No. 108.)   For the reasons that follow, these motions are **DENIED**.

### *I. BACKGROUND*

This matter arises out of a dispute regarding the termination of a defined benefit plan governed by the Employee Retirement Income Security Act ("ERISA").   Dr. Conner was a shareholder of ARI from approximately July 1995 until his resignation on November 16, 2018. (ECF No. 109 at ¶ 1.)   At all relevant times here, Dr. Conner was also a voting member of ARI's Board of Directors (the "Board").   (*Id.*)   The Board was made up of ARI's shareholders, all of whom were radiologists.   (ECF No. 105 at 2.)   At all relevant times, each shareholder of ARI had

equal voting rights.   (ECF No. 109 at ¶ 2.)   The Board met monthly to vote on matters pertinent to ARI's business, including the ARI Defined Benefit Plan (the "Plan"), which was established on or about January 1, 2000.   (*Id.* at ¶ 3; ECF No. 105 at 2.)   From time to time throughout his tenure at ARI, Dr. Conner served on ARI's Business Committee, and served as Chairman of the Business Committee between 2003 and 2006, in 2013, and again through most of 2016.   (ECF No. 109 at ¶ 4.)   Like the Board, the Business Committee also met monthly and made recommendations to the Board regarding the handling of the Plan.   (*Id.* at ¶ 5.)

### A.  Defined Benefit Plans

A brief description of defined benefit plans is necessary to understand the Plan's central role in this dispute. A defined benefit plan is what its name suggests: A known and ascertainable annuity to which a plan participant is entitled upon retirement, i.e., the benefit is defined.   (*See* ECF No. 107–1 at 2.)   *See also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) ("[A defined-benefit plan], 'as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment.'")   The value of the annuity is determined through a calculation of several factors, including the employee's tenure and compensation with the employer.   (*Id.* at 3–4.)   *See also* Treas. Reg. § 1.401-1(b).   Under a defined benefit plan, the employer bears the risk because it is the employer who takes responsibility for the investment and distribution to a retired employee.   *See Hughes Aircraft Co.*, 525 U.S. at 439 ("But the employer typically bears the entire investment risk and . . . must cover any underfunding as the result of a shortfall that may occur from the plan's investments.")   The contributions to the plan made by the employer are all pooled into a single fund—called a pension fund—which is then invested.

For a defined benefit plan to function as designed, the plan must be properly funded. Therefore, the Internal Revenue Service ("IRS") requires that employers maintain a minimum level of assets in the plan.   *See* 26 U.S.C. § 412.   ERISA also requires that a defined benefit plan hire an actuary, who is responsible for measuring the plan's funding each year and determines the plan liabilities.   *See* 29 U.S.C. § 1023(a)(4)(A).   The liabilities, which typically reflect the benefits due to the plan participants at the time of their retirements, are calculated through a series of assumptions, which are then allocated to different plan years under an "actuarial funding method."   (*See* ECF No. 107–1 at 3.)   These results are then set forth in an annual valuation report.   *See generally* 29 U.S.C. § 1023.

Once the liabilities are determined, the required minimum funding of the plan may be established, depending on the plan's status at the given time.   An "ongoing" defined benefit plan, for example, is required to maintain a minimum 80% funding—the plan's assets equal 80% of the plan's liabilities—before the plan is deemed "at risk."   *See* I.R.S. Exp. 14 (Pub. 5139) (Rev. 4-2016).   However, when a Highly-Compensated Employee ("HCE"), as defined in the plan, retires from the plan and opts to be compensated in a lump sum rather than the annuity, the IRS requires that the plan be 110% funded.   Treas. Reg. § 1.401(a)(4)-(5)(b)(3)(iv)(A).   When a plan is terminated, the plan's assets must equal 100% of the plan's liabilities as of the date of termination, and the previous "ongoing" liability calculations are discarded.   *See* 26 U.S.C.§ 417(e).   It is possible, and not infrequent, that a 100%-funded terminating plan may actually be more funded than a 110%-funded ongoing plan.

As mentioned above, the employer utilizing a defined benefit plan bears the risk of the plan.   Therefore, should a shortfall in the plan's assets occur, whether through market fluctuation,

3

the entry or exit of plan participants, or changes in interest rates, the employer is responsible for making the necessary contributions to the plan to reach the requisite funding level.   *See Hughes Aircraft Co.*, 525 U.S. at 439.   When a shortfall occurs, contributions to the plan may be allocated to the participants of the plan as pre-tax withholdings from their salary.   (*See, e.g.*, ECF No. 107–2 at 1.)   While this constitutes a common practice, the ultimate responsibility for reconciling the shortfall still remains with the employer.

ARI's historic practices with the Plan illustrate these principles.   When an ARI shareholder and Plan participant separated from ARI, the shareholder had the option of taking either an annuity or a lump sum payment.   (ECF No. 109 at ¶ 14.)   When the departing shareholder elected to take a lump sum payment, the Plan's funding was required to comply with the IRS regulations described above.   At ARI, each shareholder and Plan participant paid their share of the funding requirements on an annual basis.   (*Id.* at ¶ 16.)   The Plan's Funding Agent, Massachusetts Mutual Financial Group ("MassMutual"), determined an individual's funding requirement in consideration of age, projected retirement, and other factors.   (*Id.*)   Importantly, the payments made by the shareholders were not solely for that individual's benefit; instead, those payments contributed to the entire funding of the Plan, which included other ARI employees. (*Id.*)   Typically, if the Plan or ARI had any excess year-end expenses, the shortfalls were funded by deducting from the shareholders' net pay, through salary or bonuses.   (*Id.* at ¶ 17.)

In 2013, for example, two ARI shareholders, Drs. Cordell and Reifsteck, retired from ARI and elected to take lump sums from the Plan.[1]   (*Id.* at ¶ 18.)   At the time, the Plan was

---

[1] A third former-ARI shareholder, Dr. Mary McJunkin, retired in 2010 but received her lump sum payment from the Plan in 2013.   (ECF No. 110 at ¶ 19.)   The three-year delay was a result of the Plan not being properly funded at the time of her retirement.   (*Id.*)   Because Dr. McJunkin was no longer associated with ARI, she did not contribute to this shortfall, despite her benefit remaining as a Plan liability.   (ECF No. 105 at 3.)

4

underfunded, which required ARI to make additional, required contributions to allow the retiring physicians to take their lump sum payments. (*Id.*) Because these three individuals received their lump sum payments at once, ARI had to ensure that the Plan was funded at 110% after the withdrawal of those payments. (ECF No. 105 at 2.) These contributions were allocated to each individual shareholder in proportion to their allocable share, of which both Drs. Cordell and Reifsteck contributed. (ECF No. 109 at ¶ 18.) ARI thus contributed $606,885.00 to the Plan, which represented a 36% increase and a 52% increase from 2012 and 2011, respectively. (ECF No. 105 at 2.)

### B. The Instant Dispute

The actual events of this matter are largely not in dispute. Since its inception in 2000, the Plan had been a contentious topic within ARI, where it was discussed "a minimum of 99 times," at various Board meetings, including its potential termination. (ECF No. 109 at ¶¶ 6–7.) Common frustrations with the Plan included its complexity, unpredictable performance, and potential for generational inequity. (*Id.* at ¶ 7; ECF No. 105 at 2, n.6.) Several of the ARI members even froze their participation in the Plan at various times. (ECF No. 109 at ¶ 8.) Dr. Conner was considered a HCE under the Plan, and he was also considered a "High 25," meaning he was among the 25 highest-paid individuals at ARI. (ECF No. 109 at ¶ 20.) Under the Plan, a lump sum payment was a considered a "restricted benefit option," which meant that a lump sum payout could only be paid to a HCE if, after the payment, the Plan would still be funded to 110%. (ECF No. 108–17 at 2–3.)

The year 2018 represented a year of significant change, both actual and rumored, to ARI. First, over the course of 2018, ARI began negotiations to renew its contract with its largest client,

Charleston Area Medical Center ("CAMC").   (ECF No. 109 at ¶ 11.)   Yet, in the waning months of 2017 and continuing through this period, ARI and its employees also began hearing rumors that CAMC had issued a request for proposal to another radiology group, indicating that CAMC may replace ARI as its contracted radiology service provider.   (*Id.* at ¶ 12.)   The contract negotiations and the possibility of losing its biggest client created "additional misgivings" within ARI about the wisdom in continuing the Plan.   (*Id.* at ¶ 13.)   In addition to these negotiations, Dr. Conner submitted his notice of retirement to ARI on April 2, 2018, anticipating a retirement date of December 31, 2018.   (ECF No. 105–10.)   Later that spring, Dr. Conner also made known his desire to take a lump sum payout from the Plan.   (ECF No. 108–21.)

Around the same time, in mid-May, the Board examined the Plan's funding level in response to an inquiry by Dr. Jeffrey Damron, the then-Secretary of the Board.   (ECF No. 109 at 2.)   MassMutual provided an explanation that under effective interest rates, the Funding Target Attainment Percentage was 82% if the prefunding balance was subtracted.   (*Id.*)   Without subtracting the prefunding balance, the Funding Target would be 100%.   (*Id.*)   MassMutual went on to explain, however, that if every participant in the Plan requested a lump sum payout at the same time, the Plan would only be 68% funded under that calculation, which used "spot rates." (*Id.*)   This shortfall represented approximately $2,600,000.   (*Id.*)   Following this request, ARI began working with the Plan's Funding Agent, Massachusetts Mutual Financial Group ("MassMutual") to make arrangements for Dr. Conner to take his lump sum.   (*Id.*)

Shelby King ("King"),[2] ARI's business manager, received advice from MassMutual actuary Howard Simon that if ARI reallocated some of its 2018 contribution to 2017, ARI would

---

[2] Shelby King was originally named as an individual defendant in this case.   However, the parties have stipulated to the dismissal of all claims against her, without prejudice, pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil

only need to contribute an additional $103,000 by July 15, 2018 to reach the 110% threshold for Dr. Conner to receive his lump sum.   (ECF No. 105–12 at 2–3.)   This number was later adjusted to $142,600, which was presented to and approved by the Board at its June 2018 meeting.   (ECF No. 108–22 at 2.)   Ultimately, ARI made a final contribution in the amount of $183,100 in July. (ECF No. 105–12 at 1.)

Three months later, in September of 2018, the ARI Board voted to freeze the Plan and begin the Plan termination process.   (ECF No. 108–12 at 2.)   At the meeting, the Board noted that the Plan was "approximately $2 million underfunded," and a motion was then made and passed to withhold all bonus money through the end of the year to help make up the shortfall.   (*Id.*)   As with ARI's previous practice, each shareholder was required to pay his or her allocable share. (ECF No. 108–7 at 10.)   This included Dr. Conner, whose yearly allocation in 2018 was $68,143, and whose share of the shortfall was $258,520.   (ECF No. 108–23.)   At the Board's November meeting, a motion was made and passed to reduce radiologists' salaries as close to zero as possible for the remainder of 2018 to fund the Plan shortfall.   (ECF No. 108–24 at 3.)   In addition, the Board noted that this decision did not affect any shareholder's severance, and that "[s]everance packages would remain intact based on salary at time of notice."   (*Id.*)

In response to this change in salary, Dr. Conner resigned his employment the next day, November 16, shortly before his overnight shift was to begin.   (ECF No. 108–25.)   His resignation letter, also dated November 16, stated that the Board's decision to cut salaries was "in direct violation of the work agreement currently in effect," and declared the Board "in breach of

Procedure.   (ECF No. 98.)

that contract." (*Id.*)  Dr. Conner performed no work for ARI from November 16 until December 31, 2018, his original resignation day, or any date thereafter.  (ECF No. 109 at ¶ 35.)

On November 19, Dr. Conner asked King whether he needed to "stop by the office [] and pick up paperwork or [if] there is a form being mailed," regarding the paperwork required to request his lump sum payment.  (ECF No. 105–24 at 1.)  King responded that the forms would be mailed directly to him and, once he had completed the forms, she would sign as the Plan Administrator.  (*Id.* at 3.)  Almost one week later, Dr. Conner sent another email to King stating that, while he received correspondence regarding defined contribution options, he had not received anything about defined benefit options.  (*Id.* at 4.)  He then acknowledged that he assumed these would be in a separate mailing, which King confirmed.  (*Id.*)  In a final email exchange between Dr. Conner and King on January 3, 2019, Dr. Conner indicated that he had not received any correspondence from MassMutual about the Defined Benefit Plan, and that he had been "baffled" by the company.  (*Id.* at 5.)  Dr. Conner received the MassMutual Defined Benefit information on February 5, 2019, well after the February 1 deadline to complete and return the necessary forms. (ECF No. 105–25 at 1.)  These forms were re-noticed so that Dr. Conner could receive his estimated payout.  (ECF No. 105–26 at 3.)  Dr. Conner received his lump sum payment in July 2019, in the amount of $923,698.03, less than the amount expected by Dr. Conner of $1,051,210.80.  (*See* ECF No. 105–28 at 3.)

In the January 3 conversation, Dr. Conner asked King if she was able to comment on the Board's actions regarding his severance.[3]  (*Id.*)  By letter dated January 4, Dr. John Anton, President of the Board, responded as follows:

---

[3] No response to this message has been included in the parties' exhibits, so it is unknown whether King responded. As demonstrated above, it is of no significance since the Board itself responded to Dr. Conner's inquiry.

[P]lease note that paragraph 15(a) in your Employment Agreement with the corporation specifically states that "termination pay is contingent upon Employee's compliance with paragraph 15(b)."   Paragraph 15(b) requires that advance notice of termination of employment be provided, and provides for termination pay in varying amounts based on service and the amount of notice, with no termination pay in the case of any notice which is less than one month prior to the termination date.   Although you had originally indicated that you were going to be working through the end of 2018, you tendered your resignation on November 16, 2018, effective that same day.   (In fact, you were scheduled to work at 10:00 that night, and ARI had to rearrange schedules to secure adequate coverage.)   Given that you provided no advance notice, no termination pay is owed to you under the explicit terms of your Employment Agreement.

(ECF No. 105–29.)

C. *Procedural History*

Dr. Conner initiated this action by filing his Complaint in this Court on April 26, 2019. (ECF No. 1.)   His Complaint raised thirteen causes of action.   On June 7, 2019, Defendants filed their Answer and a motion to dismiss, and ARI asserted a counterclaim for unjust enrichment against Dr. Conner.   (ECF Nos. 7, 9.)   On February 14, 2020, this Court entered an Order denying in part and granting in part Defendants' motion to dismiss.   (ECF No. 26.)

Following this Court's Order, seven claims remained:  (i) a claim for breach of fiduciary duties pursuant to ERISA § 502(a)(3) as to all Defendants; (ii) a claim against ARI under the doctrine of *respondeat superior*; (iii) a claim for breach of common law fiduciary duties existing between shareholders to a corporation as to the Physician Defendants; (iv) a claim for breach of contract as to ARI; (v) a claim for violation of the West Virginia Wage Payment and Collection Act, W. Va. Code § 21-5-4, as to ARI; (vi) a claim for conversion as to the Physician Defendants; and (vii) a claim for civil conspiracy as to the Physician Defendants.   (ECF No. 26.)   Defendant ARI's counterclaim also remains.   (ECF No. 9.)

The parties filed their motions for summary judgment on November 13, 2020. (ECF Nos. 104, 106, 108.)   Dr. Conner filed his response on November 25, (ECF No. 111); Defendants filed both of their responses to Dr. Conner's two motions on November 27.   (ECF No. 112, 113.)   The parties filed their respective replies on December 4, 2020.   (ECF No. 115, 116, 117.)   With the briefing complete, these motions are ripe for adjudication.

## II.   LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. This rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue as to any material fact."   Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."   *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   When evaluating such factual issues, the Court must view the evidence "in the light most favorable to the opposing party."   *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production."   *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984).   Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986).   If a party fails to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial."   *Id.* at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."   *Liberty Lobby*, 477 U.S. at 256. "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff."   *Id.* at 252.

### III.   DISCUSSION

The parties have filed three motions for summary judgment, and all address the same issues.   Therefore, and in order to more efficiently address the myriad arguments within, the Court shall address the arguments pertaining to Dr. Conner's claims first.   Once the arguments regarding the causes of action in the original Complaint are addressed, the Court shall take up the arguments on Defendants' counterclaim.

#### A.   The Affirmative Causes of Action in Dr. Conner's Complaint

#### 1.   Equitable Relief for Breach of Fiduciary Duties Pursuant to ERISA § 502(a)(3)

Dr. Conner first argues that ARI and each of the Physician Defendants acted as a fiduciary and subsequently breached their duties thereby entitling Dr. Conner to equitable relief, including the recovery of the "lost balance" of his lump sum.   (ECF No. 105 at 8–14.)   In support of this argument, Dr. Conner asserts that ARI provided him a "tailored representation" by stating that its own contribution of $142,600, as well as Dr. Conner's regular annual contribution, would entitle him to his lump sum benefit.   (*Id.* at 10.)   Dr. Conner argues that ARI and the Physician Defendants then reneged on this representation by terminating the Plan and requiring Dr. Conner

11

to contribute to the termination shortfall.  (*Id.* at 10–11.)  Because of this renege, Dr. Conner asserts that Defendants breached their fiduciary duty to him pursuant to ERISA.

ERISA § 502(a)(3) permits a participant or beneficiary to bring a civil action to "obtain . . . equitable relief (i) to redress . . . violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).  Furthermore, plan sponsors have the fiduciary duty to operate an ERISA-regulated retirement plan "solely in the interest of the participants and beneficiaries and the exclusive purpose of providing benefits to participants and their beneficiaries," while also "defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1)(A).  These purposes require the fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]"  29 U.S.C. § 1104(a)(1)(B).

To establish a claim for breach of fiduciary duties based on alleged misrepresentations of an employee benefit plan, a plaintiff must prove "(1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on the misrepresentation." *Fitzwater v. CONSOL Energy, Inc.*, No. 1:17-CV-03861, 2020 WL 6231207, at *10–11 (S.D. W. Va. Oct. 22, 2020) (quoting *Burstein v. Ret. Account Plan For Employees of Allegheny Health Educ. & Research Found.*, 334 F.3d 365, 384 (3d Cir. 2003)).  The parties to this action do not seem to dispute Defendants' status as fiduciaries, but instead seem to focus on the actions taken. Specifically, the parties dispute whether the contribution required for Dr. Conner to take his lump sum was a misrepresentation.  (*Compare* ECF No. 105 at 8–9 *with* ECF No. 109 at 12.)

The Supreme Court and the Fourth Circuit "have both recognized that conveying information about plan benefits to a beneficiary in order to assist plan-related decisions can constitute fiduciary activity." *Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269, 280 (4th Cir. 2019). *See also Varity Corp. v. Howe*, 516 U.S. 489, 505 (1996). In *Dawson-Murdock*, the Fourth Circuit found that a plan fiduciary provided "tailored" advice when "he instructed [the Plaintiff] that she need not appeal [the] decision denying her benefits claim." 931 F.3d at 280. The court reasoned that this personal advice, which in turn affected the beneficiary's actions regarding her benefits claim, constituted fiduciary activity. *Id.*

Relatedly, in *Griggs v. E.I. DuPont de Nemours & Co.*, the defendants failed to adequately inform a beneficiary of the tax implications of his retirement plan, which the Defendants had been aware of before the beneficiary was to decide on a distribution. 237 F.3d 371, 381 (4th Cir. 2001). Specifically, the plaintiff alleged that the defendant employer provided an explanation of benefits to its employees that a distribution of their benefits could be accomplished tax-free; however, such distributions could not be tax free, and the employer did nothing to warn its affected employees. *Id.* There, the Fourth Circuit held that fiduciary duties were implicated where the employer "[knew] or should have [known] that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment" and, therefore, they "cannot remain silent—especially when that misunderstanding was fostered by the fiduciary's own material representations or omissions." *Id.*

Dr. Conner relies on both *Griggs* and *Dawson-Murdock* to argue that the representation made by ARI that it would contribute a certain amount to the Plan in order for him to access his lump sum payout was a "tailored representation" and that this misrepresentation was material and

a breach of its fiduciary duty.   In essence, Dr. Conner argues that following ARI's representation that it would pay the minimum shortfall amount so that Dr. Conner could receive his lump sum payout, he should not have been required to contribute to the subsequent shortfall triggered by the termination decision.   (*See* ECF No. 111 at 13.)   Conversely, Defendants argue that there was no misrepresentation: ARI told Dr. Conner what it needed to contribute to overcome the shortfall, and it contributed the required amount.   But perhaps just as important if not more so, Defendants argue that nothing they said or represented to Dr. Conner would relieve him of his obligations to the Plan as a shareholder of ARI.   (*See, e.g.*, ECF No. 115 at 3, n.1.)

It is precisely this point that prevents the Court from granting the requested relief for either party on this count.   The record is not clear as to whether Dr. Conner was told by ARI, or by anyone, that his obligations to the Plan were relieved following his retirement announcement.[4] Dr. Conner's April 2, 2018 notice itself seems to have one foot on either side of this fence:   While Dr. Conner states that he expected "there to be no major changes in current compensation," he also acknowledged that he expected the terms of his employment agreement (the "Employment Agreement")—which allowed for changes in compensation, (ECF No. 105–1 at ¶ 2)—to be "fully applicable."   (ECF No. 105–10.)   None of his conversations with King, or between King and MassMutual, or with ARI and its shareholders, point to any promise or representation to Dr. Conner that he would be relieved of his obligations to the Plan.   In fact, King testified to the contrary, that Dr. Conner would know "that he would have to pay his allocated share."   (ECF No.

---

[4] In support of Dr. Conner's assertion that he was told "that ARI would not go after [his] salary or bonus or severance pay," Dr. Conner has attached his own sworn affidavit.   (*See* ECF No. 105–11.)   A review of the record finds no corroborating evidence to this self-serving statement, and it is therefore insufficient to award summary judgment. *See, e.g.*, *Wahi v. Charleston Area Medical Center*, 453 F.Supp.2d 942, 959 (S.D. W. Va. 2006) ("Self-serving opinions, without corroborating objective evidence, are not considered to be significantly probative.")

14

105–5 at 13.)   Dr. Anton similarly testified that all of the shareholders, or "owners," of ARI also shared in the debt, including the Plan's funding shortfalls.   (ECF No. 105–9 at 7–15.)   Finally, there is no conversation or motion recorded in the Board's minutes relating to what Dr. Conner's obligations would be following his submission of the retirement notice, at least until November 15.   (*See* ECF No. 105–19.)   Based on the foregoing, there remains a reasonable question of whether the communication to Dr. Conner regarding ARI's contribution was a "tailored communication" at all.

Yet summary judgment on this point cannot be granted to ARI, either.   In notes from an informal meeting on November 15, 2018,[5] Dr. Conner apparently and explicitly stated to the other ARI shareholders and King that he "provided notice of his leaving in April on the premise of what he would be getting as far as salary, year-end bonus and severance."   (*Id.*)   Then, in the Board meeting later that same day, Dr. Conner presented his objections to changes in salary, stating the same.   (ECF No. 105–22 at 4.)   Importantly, the record also does not show that ARI rejected or otherwise corrected Dr. Conner on his stated expectations in his retirement notice. Whether an explicit rejection was absolutely necessary is another question and one the Court cannot and does not answer, but ARI, despite the apparently never-ending discussions regarding the viability of the Plan, seemed to proceed under Dr. Conner's stated assumptions.   Indeed, following an analysis by MassMutual that showed a $2,629,645 difference between the Plan's liabilities and assets in May 2018, ARI stayed the course with what was told to Dr. Conner regarding his lump sum and eventually followed through on this contribution.   (ECF No. 110 at 2.)   ARI's pursuit of this

---

[5] The memorialization of the November 15 meeting and notes therein were authored by Dr. Anton.   (*See* ECF No. 105–21 at 5.)   This meeting was not attended by the entire Board, but instead was attended by several ARI doctors and King.

option could very well have led Dr. Conner to rely on ARI's representation, thus making it tailored to Dr. Conner.   Thus, while the parties may largely agree on the basic facts of this matter, a reasonable person could easily reach different conclusions on the inferences drawn from these facts, such that summary judgment is inappropriate.   *See Cole v. Cole*, 633 F.2d 1083, 1089 (4th Cir. 1980) ("Selecting one set of conflicting inferences, as opposed to another, is part of the ultimate factfinding process, not of the disposition at the summary judgment stage.").

For the reasons stated above, the Court therefore **DENIES** Dr. Conner's motion for summary judgment, (ECF No. 104), and the Defendants' motion for summary judgment, (ECF No. 108), on the issue of whether Defendants violated their fiduciary duties pursuant to ERISA § 502(a)(3).

### 2.   *Common Law Breach of Fiduciary Duties*

Dr. Conner next argues that the Physician Defendants breached a fiduciary duty owed to the shareholders of ARI, and specifically himself, when the decision was made to terminate the Plan and reduced the shareholders' salaries to as close to zero as possible.   (ECF No. 105 at 14–15.)   Dr. Conner argues that Defendants essentially "pulled the rug out from underneath" him, and that this action was taken in bad faith to his detriment.   (*Id.* at 15.)   Defendants respond that they did not breach any fiduciary duty to Dr. Conner because there was a clear, legitimate business purpose for terminating the Plan, and that they acted in accordance with the Employment Agreement.   (ECF No. 112 at 8.)   Moreover, Defendants assert that Dr. Conner was treated no differently than any other departing physician of ARI, in particular comparing him to Drs. Reifsteck, Cordell, and McJunkin.   (*Id.* at 9.)

West Virginia has long adhered to the principle that majority stockholders in a corporation owe a fiduciary duty to the minor shareholders. *Masinter v. WEBCO Co.*, 262 S.E.2d 433, 438 (W. Va. 1980) (quoting *Meadows v. Bradshaw-Diehl Co.*, 81 S.E.2d 63, 69 (W. Va. 1954)).   A "fiduciary duty" simply means that a person has a "duty to act for someone else's benefit, while subordinating one's personal interest to that of the other person." *Elmore v. State Farm Mut. Auto Ins. Co.*, 504 S.E.2d 893, 898 (W. Va. 1998).   While this fiduciary duty is owed by the majority shareholders, officers and directors of the corporation are still afforded "rather broad latitude" in conducting the corporation's affairs. *Masinter*, 262 S.E.2d at 438. *See, e.g.*, *Meadows*, 81 S.E.2d at 68 ("It is a rule of general application that if there is no fraud or bad faith by the directors, that it is within their discretion whether they declare dividends or otherwise and courts have no right to interfere with such discretion.").

In *Masinter*, the West Virginia Supreme Court faced the question of whether a minority shareholder could assert a cause of action against his former corporation and its majority shareholders for "oppressive conduct."   For relief, the minority shareholder requested damages for the oppressive conduct, which he alleged had been his "freezing out" of the corporation, as well as dissolution of the corporation itself. *Masinter*, 262 S.E.2d at 437–38.   After acknowledging the severity of court-ordered dissolution, the Court examined the various other forms of equitable relief that its precedent allowed against a corporation or its shareholders. *Id.* at 439.   Having established that other forms of relief were able to be crafted, the Court next turned to "oppressive conduct," finding that the concept had not only been embraced by other jurisdictions, but that the Court's own precedent aligned with it. *Id.* at 440.   The Court favorably

17

cited a definition of "oppressive conduct" from the Supreme Court of Oregon, which defines the term as follows:

> [B]urdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visual departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely.

*Id.* (quoting *Baker v. Commercial Body Builders, Inc.*, 507 P.2d 387, 393–94 (Or. 1973)).   The Oregon court also noted that the question of what conduct is oppressive "is closely related to what we agree to be the fiduciary duty of a good faith and fair dealing owed by them to its minority stockholders." *Id.* (quoting *Baker*, 507 P.2d at 393–94).   Therefore, the West Virginia Supreme Court reasoned that "[a] violation of the fiduciary relationship may result from oppressive conduct, which is conduct that departs from the standards of good faith and fair dealing which are inherent in the concept of a fiduciary relationship."   *Id.* at Syl. Pt. 3, 435.

With *Masinter* as the Court's guide, the grant of summary judgment to either party on this point is inappropriate because genuine issues of material fact still exist.   Again, while the actual events of this matter do not seem to be in much dispute, the factual underpinnings of them are.

For example, while Dr. Conner acknowledges that the Employment Agreement explicitly allows for adjustments in his annual salary to be made from time to time, the Employment Agreement itself is not clear as to whether changes may be made only to his annual salary or whether those changes may be made on a monthly basis.   (ECF No. 105–1 at ¶ 2.)   Furthermore, the Employment Agreement also does not appear to contemplate adjustments that would, in effect, reduce an employee's compensation to near zero, but this fact may itself be countered by the past practice of ARI.   *See, e.g.*, Syl. Pt. 3, *Adkins v. Inco Alloys Intern., Inc.*, 417 S.E.2d 910, 911 (W.

18

Va. 1992) (recognizing that a substantial employment right may be established by implication from employer's personnel manual, policies, or custom and practice).

But more important, as to this claim, is the conflicting evidence as to whether any bad faith played a role in ARI's decisions and whether the Physician Defendants breached their fiduciary duty.   Affirmative evidence exists in the record that Dr. Conner informed ARI of his expectations and relied on ARI's perceived representations to his apparent detriment.   (*See, e.g.*, ECF No. 105–19.)   Furthermore, there is at least some evidence that the decision to terminate the Plan is directly tied to Dr. Conner's decision to leave ARI.[6]   (*See* ECF Nos. 9 at ¶ 22; 105–17.)   As was explained above, sufficient evidence exists where a reasonable jury could find that Dr. Conner explained his expectations and took actions in reliance on ARI's actions, only to have ARI renege—in Dr. Conner's words—on those actions to his detriment.

Yet, there is also sufficient evidence for a reasonable jury to conclude that ARI and the Physician Defendants acted in accordance with their fiduciary duties.   A fair reading of Dr. Conner's Employment Agreement could lead to the reasonable conclusion that ARI could change his salary and even reduce it to near zero to rectify the termination shortfall.   Corporations, and their boards and officers, are given wide latitude in the acts they can take on behalf of the entity. *See Masinter*, 262 S.E.2d at 438.   Furthermore, and a point which the parties do not apparently dispute, ARI was within its discretion to terminate the Plan, considering its volatility and changing

---

[6] Dr. Conner again relies, at least in part, on his affidavit detailing a conversation he purportedly had with Dr. Johnsey Leef one week prior to the November 15 resolution.   (*See* ECF No. 105–11.)   In this conversation, Dr. Conner asserts that Dr. Leef told him that ARI was prepared to withhold Dr. Conner's severance pay unless he contributed $330,000 to the termination shortfall.   (*Id.*)   However, a review of the record has revealed no corroborating evidence, and Defendants directly dispute this conversation occurred.   (ECF No. 112 at 8.)   As before, without more, Dr. Conner's self-serving affidavit is insufficient to award summary judgment. *See Wahi*, 453 F.Supp.2d at 959 ("Self-serving opinions, without corroborating objective evidence, are not considered to be significantly probative.")

conditions at the practice itself, including the contract negotiation with CAMC and Dr. Conner's own imminent departure.  (*See* ECF Nos. 112 at 14; 116 at 14.)

The parties differ too on whether Dr. Conner was treated any differently than his counterparts, particularly Drs. Reifsteck, Cordell, and McJunkin.   On the one hand, Defendants argue that Dr. Conner was treated no differently: ARI made the required contributions to allow these doctors to receive their lump sum, while the doctors upheld their obligations to ARI and the Plan, as was required of Dr. Conner.  (*See* ECF No. 115 at 6.)   Dr. Conner, on the other hand, points to the termination of the Plan and argues that those doctors were never asked or directed to forfeit their entire salary in order to receive their lump sum.  (ECF No. 111 at 16.)   But, as evidenced, a reasonable jury could find either way on this issue on the facts presented, and therefore summary judgment to either party is inappropriate here.   *See Cole*, 633 F.2d at 1089.

Therefore, for the reasons stated above, the Court **DENIES** Dr. Conner's motion for summary judgment, (ECF No. 104), and the Defendants' motion for summary judgment, (ECF No. 108), on the issue of whether the Physician Defendants violated their common law fiduciary duties as shareholders of ARI.

3.  *Breach of Contract and the West Virginia Wage Payment and Collection Act, W. Va. Code § 21–5–4(b)*

Next, Dr. Conner argues that he is entitled to summary judgment on his claims for breach of contract and for ARI's alleged violation of the West Virginia Wage Payment and Collection Act ("WPCA").   First, Dr. Conner argues that pursuant to his Employment Agreement, ARI could only modify his salary on an annual basis and only when making an official motion to revise Schedule 1 to his agreement, which outlined his salary.  (ECF No. 104 at 16.)   He further argues that he was entitled to severance pay because he noticed his departure from ARI "at least four

months" in advance according to the terms of his Employment Agreement, even if he departed ARI approximately six weeks early.   (*Id.*)   Dr. Conner finally argues that ARI's reliance on Dr. Conner's notice of retirement, given in April 2018, established an employment contract for a term through promissory estoppel, which ARI then breached by withholding his end-of-year pay and constructively discharging him through his resignation in November.[7]   (*Id.* at 18–19.)

Defendants counter, however, that pursuant to the Employment Agreement, ARI performed all contractual obligations required.   (ECF No. 112 at 11.)   Further, Defendants argue that by the explicit language of the Employment Agreement, the Board possessed broad authority to alter the terms of payment at its discretion.   (*Id.*)   Additionally, Defendants assert that Dr. Conner forfeited his right to severance pay because he gave no notice that he would resign on November 16, 2018.   (*Id.* at 12.)

The Court begins with Dr. Conner's Employment Agreement.   Section 2 of that agreement states, as follows:

> 2. **SALARY.**   Employee is to be compensated for services provided with an annual salary which shall be set by the Board of Directors and reviewed by the Board of Directors from time to time.   Said salary shall be set forth in Schedule No. 1 which is attached hereto and it is acknowledged that all the terms and provisions of Schedule No. 1 are incorporated herein by reference.   Payment of compensation shall be made on a monthly basis and is conditioned on Employee rendering services to [ARI] as provided in this Agreement.   Said salary may be changed, from time to time, by the Board of Directors and Schedule No. 1 will be revised accordingly.

---

[7] The Court notes that Dr. Conner's argument regarding the salary allegedly owed him is premised on a theory of promissory estoppel.   (ECF No. 105 at 17.)   By asserting promissory estoppel, Dr. Conner attempts to negate the at-will employment clause in his Employment Agreement by arguing that his resignation notice in April 2018 transformed his at-will employment into employment for term.   (*Id.*)   By attempting to establish employment for term, Dr. Conner then argues he was constructively discharged so that he may presumably recover the lost salary under a theory of breach of contract.   (*Id.*)

(ECF No. 105–1 at ¶ 2.)   Further, Section 3 of this agreement also states that "EMPLOYEE SHALL SERVE AS AN AT-WILL EMPLOYEE OF [ARI], MEANING THAT THE EMPLOYMENT RELATIONSHIP MEMORIALIZED BY THIS AGREEMENT MAY BE TERMINATED BY THE CORPORATION OR EMPLOYEE AT ANY TIME, WITH OR WITHOUT CUSE, OR WITHOUT ADVANCE NOTICE[.]"   (*Id.* at ¶ 3 (emphasis in original).) Section 15 of the agreement establishes termination, or severance, pay.   As relevant here, this section establishes the following:

15. **TERMINATION PAY.**

(a) Upon the termination of Employee's employment for reasons other than death, sickness, disability, or any other unforeseen circumstance to be determined on a case by case basis by [ARI], termination pay is contingent upon Employee's compliance with paragraph 15(b).

(b) [ARI] shall pay to him/her as termination pay an amount equal to . . . four months' salary if such termination occurs after the completion of four years of service from the date of his/her original employment with [ARI], and at least four months' notice is given, calculated from the date of termination.   If less than 4 months of notice is given, termination pay will be reduced on a pro-rata basis[.]

(*Id.* at ¶ 15.)

*i.   Section 2 of the Employment Agreement - Salary*

The Court begins with Plaintiff's salary under Section 2 of the Employment Agreement. In West Virginia, "[i]t is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them."   Syl. Pt. 3, *Cotiga Development Co. v. United Fuel Gas Co.*, 128 S.E.2d 626 (W. Va. 1962).   Whether a contract is ambiguous is a question of law to be determined by the court.   Syl. Pt. 1, *Berkeley Co. Pub. Ser. Dist. v. Vitro Corp.*, 162 S.E.2d 189 (W. Va. 1968).

22

While neither party explicitly argues that the terms of the Employment Agreement are ambiguous, the parties' divergent interpretations logically lead to that conclusion.   *See Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 468 S.E.2d 712, 717 (W. Va. 1996) ("Contract language usually is considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of words employed and obligations undertaken.")   In Dr. Conner's view, the fact that the Employment Agreement specifically identifies his salary as "annual" and ties this provision to Schedule 1—in which the amount of his annual salary is identified—means that ARI could only change his annual salary amount and only for the upcoming year.   (ECF No. 104 at 16.) Conversely, Defendants argue that the Employment Agreement establishes an annual salary that is paid monthly and may be changed by the Board at its sole discretion.   (ECF No. 112 at 11.) By the plain language of the Agreement, both interpretations are reasonable.   Section 2 does not solely speak of an annual salary, but rather an annual amount that is to be paid "monthly" and that may be altered from "time to time."   (ECF No. 105–1 at ¶ 2.)   Moreover, while the Employment Agreement clearly allows for the Board to alter salary, it is completely silent on how the Board may accomplish such changes, aside from making the revision to Schedule No. 1.   (*Id.*)   Because either of the parties' interpretations is reasonable, the provision is ambiguous.   *See Payne v. Weston*, 466 S.E.2d 161, 166 (W. Va. 1995) ("The term 'ambiguity' is defined as language 'reasonably susceptible of two different meanings' or language 'of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning [.]'")

However, the Court is unable to resolve the intent of the parties regarding Section 2 of the Agreement through external evidence, as the record is not complete on this issue.   Typically, when

a court identifies an ambiguity in a contract, it may then consider parol evidence that would show the situation of the parties, the surrounding circumstances when the contract was made, and the practical construction given the contract by the parties.   *See John D. Stump & Assocs., Inc. v. Cunningham Memorial Park, Inc.*, 419 S.E.2d 699, 707 (W. Va. 1992).   Where the evidence is not conflicting, a court must construe the contract.   *See Watson v. Buckhannon River Coal Co.*, 120 S.E. 390 (1923).   Here, however, there is scant evidence as to the intent or construction given by the parties, and indeed, ambiguity was not explicitly raised.   Therefore, the question of the Employment Agreement's meaning as to Section 2 and changes in salary brought about by the Board is best left to the trier of fact, the jury.   *John D. Stumps & Assocs., Inc.*, 419 S.E.2d at 707 (quoting Syl. Pt. 4, *Watson*, 120 S.E. at 390).

### ii.   Section 15 of the Employment Agreement - Termination Pay

Similar to the above, the Court also finds that Section 15 of the Employment Agreement, outlining how severance pay is to be collected, is ambiguous.   Dr. Conner argues that by the plain language of the provision, he gave more than four months' notice of his ultimate resignation date of November 16.   (ECF No. 105 at 18–19.)   Because April 2, 2018, the date of his notice of retirement on December 31, 2018, is more than four months ahead of November 16, his actual date of resignation, Dr. Conner asserts that ARI has wrongfully withheld his pay in violation of the WPCA.[8]   (*Id.*)   Defendants, however, maintain that Dr. Conner never provided notice of his resignation date, November 16, and instead ARI had relied on his December 31 for his termination, which Dr. Conner actually had noticed.   (ECF No. 109 at 16–17.)

---

[8] As relevant here, the WPCA establishes that "[w]henever a person, firm or corporation discharges an employee, or whenever an employee quits or resigns from employment, the person, firm or corporation shall pay the employee's wages due for work that the employee performed prior to the separation of employment on or before the next regular payday on which the wages would otherwise be due and payable[.]"   W. Va. Code § 21-5-4(b).

Cognizant that just because the parties' asserted interpretations differ does not automatically result in ambiguity, *see Berkeley Cnty. Pub. School Dist. V. Vitro Corp. of America*, 162 S.E.2d 189, 200 (W. Va. 1968), the focus of the Court's analysis is the relation between the terms "notice" and "date of termination."   Neither term is defined by the Employment Agreement. One of several definitions Merriam-Webster provides for the term "notice" is "the announcement of a party's intention to quit an agreement or relation at a specified time."   *Notice*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/notice, (last visited April 26, 2021). The Court need not overthink the "date of termination": In this case, Dr. Conner's date of termination was November 16, 2018, the date on which he resigned from ARI.   Yet, in defining these two terms, the tension is revealed.   The common usage and understanding of "notice" points to a specific time or date, something that Dr. Conner had originally provided in his April 2 letter to ARI as December 31, which would lead to the conclusion that Dr. Conner had failed to provide notice of his resignation on November 16.   But when the date of the notice is "calculated from the date of termination," pursuant to the language of the Agreement, Dr. Conner presumably satisfied the notice provision.   Therefore, the ambiguity is: Does the "date of termination" mean what is specifically identified in the notice, or does the term mean the actual date the employee leaves the practice?   The meaning itself is unclear from the text of the Agreement, and indeed, both interpretations appear reasonable.

With the ambiguity identified, the Court next considers the evidence of the parties' intent regarding the severance pay provision.   On this, the Court is confronted with conflicting evidence. Dr. Anton, one of the named Physician Defendants here, testified as follows:

> I would think there's some common sense rules that apply.   If you're going to tell someone hypothetically that I'm going to retire five years from now and I decide

to leave in five months, that doesn't mean I'm entitled to my particular severance. You realize in the medical practice we change and – you know, we schedule people on call, we try to create a situation that's safe for the community and safe for our patients. So when you start changing when you're going to work, that changes everyone else's way that they have to work . . . . there's a responsibility inherent as a physician to the community and our patients.  So that's why we ask for four months' severance, that's why it gives us time to plan for these things, to plan call.

(ECF No. 108–13 at 4–5.)   Yet, Dr. Conner has produced some conflicting evidence on this intent, as at least one doctor at ARI believed Dr. Conner should have been paid severance at the time of his termination.   (*See* ECF No. 105–32.)   Beyond the parties' own assertions, no other evidence has been provided as to the meaning of this provision, and therefore, summary judgment is inappropriate.   Thus, the question of the Employment Agreement's meaning as to Section 15 and severance pay, as well as whether Dr. Conner is entitled to such pay—and subsequent damages under the WPCA—is best left to the jury.  *John D. Stumps & Assocs., Inc.*, 419 S.E.2d at 707 (quoting Syl. Pt. 4, *Watson*, 120 S.E. at 390).

Therefore, for the reasons stated above, the Court **DENIES** Dr. Conner's motion for summary judgment, (ECF No. 104), and the Defendants' motion for summary judgment, (ECF No. 108), on Dr. Conner's claims for breach of contract and violation of the West Virginia Wage Payment and Collection Act.

### 4.  Conversion and Civil Conspiracy

As to the final affirmative claims of Dr. Conner's Complaint, Dr. Conner argues that he had an "ownership interest" in the funds due him under his term contract—premised on his promissory estoppel theory, above—and that the Physician Defendants "schemed to terminate the Plan" with the goal of restricting Dr. Conner's access to the lump sum, forcing his participation in the funding of the termination shortfall, and withholding all funds due to him under his term

contract.   (ECF No. 105 at 19–20.)   Defendants counter that Dr. Conner cannot prevail on his claims, as he has proffered no evidence supporting a breach of their fiduciary duties, upon which his tort claims are premised, and that he cannot prove the elements of these claims.   (ECF No. 109 at 19.)

In West Virginia, "[a]ny distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion and it is not necessary that the wrongdoer apply the property to his own use."   Syl. Pt. 17, *Rodgers v. Rodgers*, 399 S.E.2d 664, 668 (W. Va. 1990).   The Fourth Circuit has clarified that "[a] plaintiff cannot bring a claim for conversion unless he has a property interest in and is entitled to immediate possession of the converted item."   *Worldcom v. Byne*, 68 Fed App'x 447, 454 (4th Cir. 2003) (internal quotations omitted).   As to civil conspiracy, in West Virginia it is "a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means.   The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff."   Syl. Pt. 8, *Dunn v. Rockwell*, 689 S.E.2d 255, 259 (W. Va. 2009).

As Dr. Conner recognizes, "the success or failure of [his] tort claims hinge on the disposition of the legal claims which precede them."   (ECF No. 116 at 19.)   As demonstrated above, the Court has found there to be disputes of material fact on nearly every point that has been raised by the parties.   As such, the resolution of those matters—the claims for breach of fiduciary duties under ERISA, breach of common law fiduciary duties, breach of contract, and the violation of WPCA—bear directly on the determination of Dr. Conner's tort claims.   Therefore, for the reasons more fully explained above, the Court **DENIES** Dr. Conner's motion for summary

judgment, (ECF No. 104), and the Defendants' motion for summary judgment, (ECF No. 108), on Dr. Conner's conversion and civil conspiracy claims.

### B.   Dr. Conner's Motion for Summary Judgment on the Defendants' Counterclaim

Dr. Conner next asks this Court to grant him summary judgment on ARI's counterclaim for unjust enrichment.   First, Dr. Conner argues that the corporation, ARI, lacks standing to assert a claim, as ARI's *shareholders* bore the responsibility for covering the Plan's termination shortfall. (ECF No. 107 at 10.)   Next, Dr. Conner argues that any enrichment of his was not unjust, as he was not an ARI shareholder at the time of termination of the Plan.   (*Id.* at 12.)   Because he was not a shareholder, Dr. Conner asserts that he had no responsibility to contribute to the termination shortfall.   (*Id.* at 12–13.)   Finally, Dr. Conner argues that ARI's claim is barred by the Defendants' own wrongdoing; in particular, ARI cannot recover because of the alleged tailored communication it gave him in June 2018 regarding his lump sum payout.   (*Id.* at 9–10.)

Defendants respond by arguing that the basis of the unjust enrichment claim is Dr. Conner's dual roles with ARI: Dr. Conner was a participant in the Plan, but more importantly, he was a shareholder of ARI and therefore carried some responsibility for the termination shortfall.   (ECF No. 113 at 4–5.)   That dual role, ARI argues, bears directly on the claimed unjustness: "To allow Dr. Conner to retain the benefit of one role, without shouldering the coordinating burden of the other is the definition of unjust enrichment."   (*Id.* at 5.)   Finally, ARI addresses Dr. Conner's standing argument, asserting that it does not matter how the shortfall itself was reconciled, as ARI as the entity and Plan sponsor bore the responsibility of funding the shortfall.   (*Id.* at 8.)

### 1.  Standing

The Court first addresses Dr. Conner's argument as to ARI's standing to assert its counterclaim for unjust enrichment.  Dr. Conner's argument is, essentially, that ARI has not suffered an "injury" but rather, if an injury is present, then it is the shareholders who have been injured.  (ECF No. 107 at 11.)

To establish standing, a plaintiff "must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).  Dr. Conner apparently challenges the first requirement of standing—notwithstanding his assertion that there was no "unjust" enrichment traceable to his own actions—by claiming that the shareholders of ARI suffered the alleged injury, not ARI itself.   (ECF No. 107 at 11.)

Dr. Conner's argument falls short.   As explained above, 26 U.S.C. § 412(b)(1) establishes that "the amount of any contribution required by this section . . . shall be paid by the employer responsible for making contributions to or under the plan."  *See also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999).  Dr. Conner even acknowledges, "[i]n the event of a plan termination, . . . the liability rests upon the Plan Sponsor, the employer, to make up the difference." (*Id.* at 5.)  Dr. Conner attempts to muddy the water by maintaining that, in the end, it is the shareholders who ultimately have to pay the necessary contribution to remedy the shortfall, but this assertion misses the larger context: ARI is ultimately responsible for funding the Plan.  *See, e.g.*, *Thole v. U.S. Bank N.A.*, 140 S.Ct. 1615, 1620 (2020) ("But in order to claim 'the interests of

others, the litigants themselves still must have suffered an injury in fact, thus giving' them 'a sufficiently concrete interest in the outcome of the issue in dispute.'")   ARI has alleged that Dr. Conner's failure to contribute to the termination shortfall injured ARI, to the tune of $326,695.00, because ARI is responsible for the funding of the Plan.   (ECF No. 9.)   And because ARI itself is responsible for the shortfalls in funding pursuant to ERISA, it has articulated a concrete and particularized injury in fact, such that it has established standing.

### 2.  Unjust Enrichment

The equitable principle of unjust enrichment allows that where "benefits have been received and retained under such circumstance that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the party receiving the benefits to pay their reasonable value."   *Realmark Developments, Inc. v. Ranson*, 542 S.E.2d 880, 884–85 (W. Va. 2000).   Thus, "[t]he elements of a claim for unjust enrichment under West Virginia law are: (1) a benefit conferred upon the defendant, (2) an appreciation or knowledge by the defendant of such benefit, and (3) the acceptance or retention by the defendant of the benefit under such circumstances as make it inequitable for the defendant to retain the benefit without payment of its values."   *CSS, Inc. v. Herrington*, 306 F. Supp. 3d 857, 881–82 (S.D. W. Va. 2018) (internal quotation omitted).

Here again, summary judgment cannot be granted to either party as questions of fact that are material to this dispute remain.   This claim, and the facts that it is based on, is inextricably intertwined with the other claims in this matter and could be thus said to depend on the resolution of the facts the Court has already identified in relation to those other claims.

In essence, Dr. Conner argues that his obligations to the Plan, as a shareholder of ARI, ceased when he communicated his retirement to ARI.   (*See* ECF No. 117 at 3–4.)   ARI, of course, maintains that his shareholder obligations to the Plan continued, especially in consideration of the fact that Dr. Conner remained a shareholder when the decision to terminate the Plan was made, as well as when the decision to reduce salaries was made.   (ECF No. 113 at 4–5.)   As demonstrated throughout this Order, there remain material facts in dispute as to these questions, particularly regarding the alleged "tailored communication" and what, if any, responsibilities Dr. Conner possessed as a shareholder following that correspondence.

Therefore, for the foregoing reasons, Dr. Conner's motion for summary judgment on ARI's counterclaim, (ECF No. 106), is **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons, Dr. Conner's Motion for Summary Judgment on Affirmative Claims of Complaint, (ECF No. 104), and Motion for Summary Judgment on Counterclaim, (ECF No. 106), and Defendants' Motion for Summary Judgment, (ECF No. 108), are **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        May 5, 2021

THOMAS E. JOHNSTON, CHIEF JUDGE